**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

NATHAN A. COOK
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

January 30, 2024

David S. Eagle
Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801

Kevin M. Coen
Emily C. Friedman
Morris Nichols Arsht & Tunnel LLP
1201 N. Market Street
Wilmington, DE 19801

RE: *Red Cat Holdings, Inc., et al. v. Autonodyne LLC, et al.*
C.A. No. 2022-0878-NAC

Dear Counsel:

This letter decision resolves the defendants' motion to dismiss as it relates to the plaintiffs' claims against defendant Autonodyne LLC ("Autonodyne" or the "Company").[1] For the reasons below, those claims must be dismissed.

## I. FACTUAL BACKGROUND

I have drawn the relevant facts from the Verified First Amended Complaint (the "Amended Complaint") and the documents incorporated by reference or integral to it.[2]

---

[1] *Red Cat Holdings, Inc. v. Autonodyne LLC, et al.*, C.A. No. 2022-0878-NAC, Docket ("Dkt.") 24, Defendants' Motion to Dismiss the Verified First Amended Complaint (the "Motion to Dismiss"). Pursuant to my forthcoming order, I am deferring my decision on the claims brought against Daniel Schwinn.

[2] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004). Citations in the form of "AC ¶ __" refer to the Amended Complaint. Dkt. 23. Citations in the form of "SLA § __" refer to Exhibit 1 to the Amended Complaint. Dkt. 23. Citations in the

## A.    The Parties

Plaintiff Teal Drones, Inc. ("Teal Drones") is a subsidiary of plaintiff Red Cat Holdings, Inc. ("Red Cat") (together, "Plaintiffs").[3] This case arises from a Software Licensing Agreement (the "SLA") that Teal Drones entered with defendant Autonodyne in May 2022.[4] Plaintiffs allege that defendant Daniel Schwinn (together with the Company, "Defendants") is Autonodyne's principal equity holder.[5]

## B.    The Software Licensing Agreement

The SLA emerged from a professional collaboration between Teal Drones and Autonodyne that had been ongoing since 2020.[6] The parties devised this document to regulate Teal Drones's use of the Company's avionics software.[7] The SLA gave Teal Drones a non-exclusive license to use certain avionics software and a limited

---

form "OB at __" refer to the Opening Brief in Support of Defendants' Motion to Dismiss the Verified First Amended Complaint.  Dkt 29.  Citations in the form "AB at __" refer to the Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss the Verified First Amended Complaint.  Dkt. 33.

[3] AC ¶ 1.

[4] AC ¶ 22; *see also* SLA.

[5] AC ¶ 9.

[6] AC ¶ 18.

[7] AC ¶¶ 22–23.

exclusive license "to certain functionality in the avionics software."[8]  This enabled the Company to carry on servicing other customers, to the extent doing so did not conflict with the functionality it exclusively licensed to Teal Drones.[9]

Three sections of the SLA are of particular significance here: Sections 15.3, 9, and 14.3 (b)–(c).

Section 15.3 restricts public announcements relating to the SLA.  It provides that "[n]either party shall issue or release any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement . . . in each case, without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed."[10]

Section 9 governs confidentiality.  Section 9.1 defines "Confidential Information."  The definition includes "all Specifications and unpublished Documentation" and further provides that "the terms of this Agreement are and will remain the Confidential Information of both parties."[11]

---

[8] AC ¶ 23; *see also* SLA § 2.1 (describing the software license).

[9] *See, e.g.*, SLA § 7.4(a) (contemplating that the Company would have and continue to provide services to its "other customers").

[10] SLA § 15.3.

[11] *Id.* § 9.1.

Section 9.3 restricts the parties' use of Confidential Information. It states: "As a condition to being provided with any disclosure of or access to Confidential Information, the Receiving Party shall: (a) not access or use Confidential Information other than as necessary to exercise its rights or perform its obligations under and in accordance with this Agreement[.]"[12]

Section 14.3(b) grants the Company an express right to terminate the SLA if Teal Drones breaches Section 9. It provides that: "[Autonodyne] may terminate this Agreement, effective on written notice to [Teal Drones], if . . . [Teal Drones] breaches any of the terms or conditions of Section 2.3, Section 3, Section 9, or Section 10[.]"[13]

Lastly, Section 14.3(c) gives either party the right to terminate the SLA in the event of a counterparty's uncured or uncurable material breach. It provides that:

> [E]ither party may terminate this Agreement, effective on written notice
> to the other party, if the other party materially breaches this Agreement,
> and such breach: (i) is incapable of cure; or (ii) being capable of cure,

---

[12] *Id.* § 9.3. Section 9.3(d) is also relevant. It states that the Receiving Party shall "ensure its Representatives' compliance with, and be responsible and liable for any of its Representatives' non-compliance with, the terms of this Section." *Id.* The parties do not dispute that Red Cat is Teal Drones's "Affiliate," as that term is defined in the SLA. The SLA also defines "Representatives" as including a parties' Affiliates' "employees, officers, directors, agents, and legal advisors." *Id.* § 1.

[13] SLA § 14.3(b), Preamble (defining "Licensor" as "Autonodyne" and "OEM" as "Teal Drones").

remains uncured 30 days after the nonbreaching party provides the breaching party with written notice of such breach[.][14]

## C.    The Email Exchange

On August 21, 2022, Jeff Thompson from Teal Drones emailed Autonodyne's CEO, Steve Jacobson.[15]  Thompson's email to Jacobson stated the following:

> Jake, Not sure if you saw Teal / Reveal Technologies press release but the response has been tremendous and it's already generating orders.  I wanted to give you the heads up that we're developing a similar release about the Teal and Autonodyne relationship.  Let me know if you have any objections, or if you want to send us a quote or have our PR team make a quote[.][16]

Three minutes later, Jacobson responded: "That sounds great. I'm on vacay all week up in the Adirondacks.  You guys can make up some quote - I'm sure it will be fine or at least a great start."[17]

## D.    The Press Release

Two days after the email exchange—without further contacting Jacobson or the Company regarding the press release—Red Cat issued a press release detailing

---

[14] SLA § 14.3(c).

[15] AC ¶ 45, Ex. 2 (email exchange).  The SLA designates Jacobson as the person to whom any consents, requests, notices, or other communications must be sent for the communications to have legal effect.  *See* SLA § 15.4.

[16] AC ¶ 45 (footnote omitted), Ex. 2.

[17] *Id.*

Teal Drones's relationship with the Company (the "Press Release").[18]  Neither

Jacobson nor the Company ever saw a draft of the Press Release before Red Cat

published it.  In the Amended Complaint, Plaintiffs allege that the "Press Release

quoted the exact language of the SLA regarding the exclusive rights that the SLA

granted to Teal Drones."[19]  The Press Release also stated that:

> Under the terms of the agreement, Autonodyne software will only be made available to Teal, effectively jumping Teal ahead of other drone companies seeking to provide multi-vehicle control or capabilities like unlimited surveillance.  Competitors will have to develop their own software or secure licenses from others with inferior test performance.[20]

### E.    Termination And Litigation

On August 26, 2023, three days after Red Cat issued the Press Release, the

Company delivered a letter to Teal Drones purporting to terminate the SLA (the

"Notice").[21]  The Notice explained that, in addition to "grossly mischaracteriz[ing]

the terms of the Agreement," Red Cat issued the Press Release without the

Company's consent and included Confidential Information in the published

material.[22]  Thus, the Notice concluded, Plaintiffs breached Sections 9 and 15.3 of

---

[18] AC ¶ 47; OB Ex. C (Press Release).

[19] AC ¶ 48.

[20] OB Ex. C.

[21] *See* AC ¶ 50, Ex. 3.

[22] *See id.*

the SLA, which triggered the corresponding termination rights in Section 14.3(b) and (c), respectively.[23]

Plaintiffs allege that, after delivering the Notice, the Company stopped performing under the SLA.[24] For Schwinn's involvement, Plaintiffs allege that he made the Company's decision to send the Notice and that Schwinn directed the Company's employees to stop performing under the SLA.[25]

Litigation ensued. The Amended Complaint asserts five claims. Count I is a claim for breach of contract; Count II, breach of the implied covenant; Count III, tortious interference with contractual relations and prospective contractual relations; Count IV, declaratory judgment; and Count V, injunctive relief. Plaintiffs assert Counts I, II, IV, and V against the Company. Plaintiffs assert Counts III and IV against Schwinn.

## II.    LEGAL ANALYSIS

Defendants moved to dismiss all counts for failure to state a claim. Defendant Schwinn also moved to dismiss the claims against him for lack of personal

---

[23] *See id.* Ex. 3.

[24] *See id.* ¶ 53.

[25] *Id.* ¶ 55.

jurisdiction. Personal jurisdiction is addressed in a separate order. This decision solely addresses dismissal of Plaintiffs' claims against the Company.

"The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (i[v]) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[26] But, "[i]f a complaint were held sufficient simply because it restates the legal elements of a particular cause of action, Rule 8(a) would be rendered meaningless."[27] Accordingly, "[n]otwithstanding Delaware's permissive pleading standard, the court may disregard mere conclusory allegations made without specific allegations of fact to support them. Pleading serial facts 'on information and belief' is no substitute for well-pled facts that will support a reasonable inference of wrongdoing."[28]

---

[26] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[27] *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *4 n.28 (Del. Ch. Oct. 17, 2007).

[28] *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2022 WL 3010640, at *20 (Del. Ch. July 29, 2022) (quoting *In re Xura, Inc. S'holder Litig.*, 2019 WL 3063599, at *3 (Del. Ch. July 12, 2019)).

**A.      The Amended Complaint Fails To State A Claim For Breach Of Contract**

Plaintiffs allege that the Company breached the SLA in two ways.  First, they allege the Company improperly declared the SLA terminated and ceased fulfilling its obligations, including its exclusivity obligations.  Second, in the event the Company properly terminated, Plaintiffs argue the Company failed to fulfill certain obligations that survive the SLA's termination.

**1.      Plaintiffs' Allegations Regarding Termination Of The SLA**

"Under Delaware law, the proper interpretation of language in a contract is a question of law.  Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language."[29]  "In construing a contract, our goal is to give effect to the intent of the parties."[30]  "[I]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."[31]  "When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning."[32]  Delaware "respects the

---

[29] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[30] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

[31] *Id.* (quoting *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912, 913–14 (Del. 2017)).

[32] *Allied Cap. Corp.*, 910 A.2d at 1030.

right of parties to freely contract and to be able to rely on the enforceability of their agreements[.]"[33]

In resolving a motion to dismiss, I may consider the allegations and documents incorporated by reference or otherwise amenable to judicial notice.[34] Defendants argue that the Amended Complaint and its exhibits, plus certain limited documents otherwise incorporated by reference, make unequivocally clear that Plaintiffs breached Sections 9 and 15.3 of the SLA. If correct, Defendants argue that Plaintiffs' breach triggered the Company's clear, bargained-for rights to terminate the SLA.

For their part, Plaintiffs do not dispute that I may consider these materials at the pleading stage. The only issue that I must resolve is whether I may conclude, at this stage, that Plaintiffs triggered the Company's termination rights and Plaintiffs' allegations fail to state a reasonably conceivable claim.

For the reasons explained below, I conclude that Plaintiffs' own allegations and exhibits make plain their breach of both Section 9 and Section 15.3 of the SLA. Plaintiffs' assertions in response do not give rise to a reasonably conceivable basis

---

[33] *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 565–66 (Del. Ch. 2023) (citation omitted).

[34] *See Wal-Mart Stores, Inc.*, 860 A.2d at 320 (Del. 2004).

to conclude that the SLA remains in effect.[35]  Plaintiffs' first claim for breach must accordingly be dismissed.

### a.    Section 9

Section 9.1 of the SLA provides that "the terms of this Agreement" fall within the ambit of "Confidential Information."[36]  Section 9.3(a) prohibits access to or use of Confidential Information other than as required to exercise a right or perform an obligation under the SLA.[37]  Section 14.3(b) permits the Company to "terminate this Agreement . . . if . . . [Teal Drones] breaches any of the terms or conditions of . . . Section 9."

The Press Release disclosed that, "[u]nder the terms of the license, Teal has secured exclusive right to Autonodyne's software suite for 'autonomy and exchange of control among humans and machines to perform tasks involving crewed and/or uncrewed vehicles.'"[38]  Plaintiffs' Amended Complaint confirms that "[t]he Press Release quoted the exact language of the SLA regarding the exclusive rights the SLA

---

[35] Below, I separately address Plaintiffs' claim for breach of the limited SLA provisions that survive termination.

[36] *See* SLA.

[37] *Id.*  Sections 9.3(b) and (d) of the SLA are relevant only to demonstrate that Teal Drones is liable for Red Cat and its agents' conduct in issuing the Press Release.  *See id.* § 1 (defining "Affiliate" and "Representative").

[38] OB Ex. C.

granted[.]"[39]  Plaintiffs' Amended Complaint also characterizes the "[e]xclusivity of these software functions" as a "material term of the SLA, and a key aspect of the bargain to which Teal Drones agreed."[40]

The parties to the SLA bargained over its terms.  Those terms include the definition of Confidential Information.  The definition of Confidential Information plainly includes the SLA's terms.[41]  The parties also bargained for a term prohibiting the disclosure of Confidential Information and a term giving rise to a termination right in the event of breach of that prohibition.[42]

These terms are express and plain.  No party has argued that these terms are ambiguous, nor could they.  "Under Delaware law, sophisticated parties are bound by the terms of their agreement. . . . As we have explained, '[p]arties have a right to

---

[39] AC ¶ 48; *see also* Dkt. 45, Tr. 10-23-2023 Oral Argument on Defendants' Motion to Dismiss ("OA Tr.") 80:7–21 ("I think that's a quote directly from the software licensing agreement.").

[40] AC ¶ 86.

[41] No party has argued that Teal Drones is not a "Receiving Party" with respect to the SLA. This is understandable, as to argue otherwise would render the text surplusage. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract . . . so as not to render any part of the contract mere surplusage.").

[42] *See* SLA §§ 9 (defining and restricting use of Confidential Information), 14.3 (granting the Company a termination right for breaches by Plaintiffs of Section 9).

enter into good and bad contracts, the law enforces both.'"[43] Thus, "the court's role is to enforce the agreement as written."[44]

When Plaintiffs disclosed a quotation from the SLA, they disclosed Confidential Information. This disclosure breached the terms of Section 9.[45] This breach entitled the Company to terminate the SLA pursuant to its express termination right in Section 14.3(b). And the Company exercised this right.[46]

Plaintiffs suggest that, notwithstanding the breach of Section 9 and termination right under Section 14.3(b), I should consider their allegations that the Company consented to Red Cat publishing the Press Release under Section 15.3. But, as I describe in the next section, Plaintiffs do not allege a reasonably

---

[43] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

[44] *Id.*

[45] Plaintiffs also argue that the Press Release did not reveal any material terms of the SLA, and thus no Confidential Information was disclosed. *See, e.g.*, AB at 15. But their characterization of the exclusivity provision as a "material term" belies this assertion. *See* AC ¶ 86. Moreover, "Confidential Information," as defined in Section 9.1, is not qualified by an SLA term being a "material" term. *See* SLA. The same is true for the prohibition against disclosure contained in Section 9.3(a) and the termination right contained in Section 14.3(b). *Id.* Moreover, the very next subsection in Section 14.3 (*i.e.*, Section 14.3(c)) deals expressly with material breaches. Thus, within the SLA's four corners appears the "negative implication" that the breaches of the provisions set forth in Section 14.3(b) need not be material breaches to trigger the termination right contained therein. *See, e.g.*, *Fortis Advisors LLC v. Medicines Co., & Melinta Therapeutics, Inc.*, 2019 WL 7290945, at *4, *4 n.33 (Del. Ch. Dec. 18, 2019) (applying *expressio unius est exclusio alterius*).

[46] *Compare* AC Ex. 3 (Notice), *with* SLA § 15.4.

conceivable basis to keep their claims alive. I thus conclude it is not reasonably conceivable that the Company failed to properly terminate the SLA under Sections 9 and 14.3(b).

### b. Section 15.3

Section 15.3 provides that "[n]either party shall issue or release any . . . press release . . . relating to this Agreement . . . without the prior written consent of the other party."[47] This language is unambiguous. Before issuing the Press Release, Plaintiffs were required to first obtain the Company's "prior written consent." There is no dispute over whether the Press Release was subject to the requirements of Section 15.3 as "relating to this Agreement."[48] Thus, absent the "prior written consent" required by Section 15.3, Plaintiffs breached the SLA, irrespective of whether the Press Release disclosed Confidential Information.

Plaintiffs argue it is reasonably conceivable that Jacobson's reply email to Thompson constituted consent to publish the Press Release.[49] Even affording

---

[47] SLA.

[48] Moreover, "our courts have considered the connector 'relating to'" and interpret it plainly as being "paradigmatically broad[.]" *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at *5 (Del. Ch. Feb. 16, 2011).

[49] AB at 16–18.

Plaintiffs the plaintiff-friendly inferences to which they are entitled, Plaintiffs' argument fails.

There are two ways to view Plaintiffs' argument, both of which I address below. First, I consider Jacobson's email and whether it is reasonably conceivable that his email constituted the consent required by Section 15.3. Second, I consider the logical reciprocal, that is, whether Section 15.3 can be reasonably interpreted as satisfied by Jacobson's email. Plaintiffs' argument fails under both assessments.

Jacobson sent his email in near-immediate reply to Thompson's email. Thompson's email provides that he is writing to "give [Jacobson] a heads up that [Plaintiffs were] developing a similar release" to the Reveal Technologies press release.[50] Thompson asks if Jacobson has objections. Thompson also asks if Jacobson wants to send a quote for inclusion or "have our PR team make a quote[.]"[51]

Jacobson replied within three minutes. Jacobson writes: "That sounds great. I'm on vacay all week up in the Adirondacks. You guys can make up some quote – I'm sure it will be fine or at least a great start."[52]

---

[50] AC Ex. 3.

[51] *Id.*

[52] *Id.*

In this email, Jacobson communicated his consent to Thompson's continued development of a press release and qualified permission to make up a quote for him as part of that development process. No more and no less. It is not reasonably conceivable that this email provided Plaintiffs with the necessary consent to publish a press release relating to the SLA, particularly one containing Confidential Information, sight unseen.

Plaintiffs highlight two parts of Jacobson's email: "That sounds great" and "[y]ou guys can make up some quote - I'm sure it will be fine[.]"[53] The former can only be understood as Jacobson's response to the contents of Thompson's email, which did not seek consent for publication. Regardless of how much Plaintiffs may wish it to be true, Jacobson's reply cannot be contorted into a response to a question Thompson did not ask. That is, whether the Company consented to Plaintiffs' publication of the Press Release. Thus, it is not reasonably conceivable that this language constituted the requisite consent.

The latter quotation ("I'm sure it will be fine") can only be reasonably read as permissive of Plaintiffs making up some quote as a part of the contemplated press

---

[53] *See* AB at 8, 17, 25. For obvious reasons, Plaintiffs would prefer to ignore the second sentence of Jacobson's email, namely that he was *on vacation*. Although I do not rely on this point, I note it is consistent with the notion that Plaintiffs assumed the risk of their action here.

release's development.  Jacobson connects "I'm sure it will be fine" with a hyphen to the first part of the sentence, "[y]ou guys can make up some quote."  Even in that, it is further qualified by the "or at least a great start" language that trails.  Here, I also conclude it is not reasonably conceivable that this language constituted the necessary consent to publish the Press Release.

Plaintiffs also point to Thompson's invitation to raise objections.  They argue this should be read broadly to refer to any and all objections to a "proposed press release."[54]  Even assuming that is true, Thompson's email does not mention *publication* of *the* Press Release or, for that matter, *publication* of *any* press release.  Jacobson stated no objection to developing a press release.  That is fine as far as it goes.  But Section 15.3, by its plain terms, requires Plaintiffs to obtain consent for publication of a press release relating to the SLA.  The parties bargained for that term.  Plaintiffs cannot reasonably argue that Section 15.3 permitted Plaintiffs simply to give notice and, absent receipt of objections, to proceed with publishing a press release—particularly a press release disclosing Confidential Information.

Having addressed the reasonableness of reading Jacobson's email as consent, I turn now to consider the logical reciprocal of Plaintiffs' argument.  This secondary assessment considers whether Section 15.3 can be interpreted as satisfied by

---

[54] AB at 25 (discussing the implied covenant).

Jacobson's email. As I explain below, Plaintiffs' reading reflects a commercially unreasonable interpretation of the SLA that I must reject, even at the motion to dismiss stage.[55]

Here, the parties bargained for an express term defining the SLA's terms as Confidential Information. The parties also bargained for a term that, upon disclosure of this Confidential Information, gives rise to a termination right not subject to cure or any materiality analysis.[56] The only exception to the prohibition on publishing press releases "relating to this Agreement" requires Plaintiffs to obtain "prior written consent" for the disclosure.[57]

Here, Plaintiffs sent a short email and Jacobson replied three minutes later saying he was on "vacay all week." Plaintiffs decided not to send a draft of the Press Release to the Company before proceeding with publication. And, in addition to Plaintiffs' own statement that they disclosed Confidential Information in the Press Release,[58] Plaintiffs went on, according to Defendants, to mischaracterize the parties' relationship in a way that benefitted Plaintiffs and injured the Company.

---

[55] *See Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1211 (Del. 2021).

[56] SLA §§ 9, 14.3(b).

[57] *Id.* § 15.3.

[58] *Compare* AC ¶ 48 (the "Press Release quoted the exact language of the SLA"), *with* SLA § 9.1.

These are precisely the sort of effects that are avoided by requiring "prior written consent" before publication of Confidential Information in a press release.[59] The logical reciprocal to Plaintiffs' reading—that Section 15.3 is satisfied by Jacobson's email—would thus be seen to countermand one of the very purposes Section 15.3 was obviously designed to serve. This Court "cannot countenance such an absurd interpretation."[60]

The foregoing compels me to conclude that it is not reasonably conceivable that Jacobson's reply email constituted the consent required by Section 15.3 and that no commercially reasonable reading of Section 15.3 can be seen as satisfied by Jacobson's email.[61] Accordingly, by issuing the Press Release, Plaintiffs breached Section 15.3.

---

[59] *See eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *17 (Del. Ch. Sept. 30, 2013) ("the difficulty in quantifying the damages for a breach of the confidentiality provisions is probably why the parties included these provisions in the Agreement and carved them out from the limitation of liabilities section"); OA Tr. 87:5–88:21.

[60] *Osborn*, 991 A.2d at 1161.

[61] Plaintiffs also assert that "Jacobson did not ask to see or review a draft of the press release." AB at 17. But the unambiguous terms of Section 15.3 did not require that Jacobson request to see or review a draft; instead, it required "prior written consent," which Jacobson did not provide. *See* SLA § 15.3.

Section 14.3(c) permits termination by either party upon a material breach of the SLA.[62]  Given my analysis concerning the Company's termination under Sections 9 and 14.3(b) and Plaintiffs' argument as to consent, I can stop my analysis here and need go no further.  That said, I note that, except for a single conclusory allegation,[63] Plaintiffs fail to otherwise allege or argue that their breach of Section 15.3 was not material.  It is not hard to see why.  The parties expressly bargained for a prohibition on the disclosure of Confidential Information.  The Press Release is not a generic press release addressing Autonodyne matters.  Instead, by Plaintiffs' admission, it discloses Confidential Information.  Information that Plaintiffs' themselves characterize as including a "material term."[64]  There is no reasonable, or reasonably conceivable, argument that Plaintiffs' action did not constitute a material breach of the SLA.[65]

---

[62] Section 14.3(c) of the SLA only permits termination for a material breach that goes uncured for 30 days or is unable to be cured.  Plaintiffs appear to have continued operating at all times as if Defendants never terminated the SLA and have not alleged any attempt to cure the breach derived from publishing the Press Release.  *See, e.g.*, OA Tr. 65:1–67:3.

[63] AC ¶ 58(g).

[64] *See* AC ¶ 86 ("Exclusivity of these software functions is a material term of the SLA, and a key aspect of the bargain to which Teal Drones agreed.").

[65] "A 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the *essential purpose* of the contract or makes it impossible for the other party to perform under the contract." *eCommerce Indus., Inc.*, 2013 WL 5621678, at *13, *19 (finding disclosure of confidential information was a

For the foregoing reasons, I must reject Plaintiffs' first breach of contract theory as failing to state a claim.

### 2. Plaintiffs Have Not Adequately Pled A Breach Of The Terms Surviving The SLA's Termination

Under their second breach of contract theory, Plaintiffs allege breaches of the SLA arising under Sections 2.1, 4.1, 6.1, 7, 9, 14.1, and 14.3.[66] Section 14.7 identifies the limited terms of the SLA that survive its termination.[67] The only overlap between the provisions under which breach is alleged and the provisions identified in Section 14.7 as surviving termination are Sections 7.1, 7.2, and 9.[68]

Thus, in light of my analysis above, the remaining question here is whether Plaintiffs have alleged sufficient facts that make it reasonably conceivable that the Company breached any surviving obligations arising under Sections 7.1, 7.2, or 9.

---

material breach of provision prohibiting disclosure and thus holding that non-breaching parties validly terminated the contract).

[66] *See* AC ¶ 58; AB at 9–10.

[67] SLA § 14.7 ("Surviving Terms. The provisions set forth in the following Sections, and any other right or obligation of the parties in this Agreement that, by its nature, should survive termination or expiration of this Agreement, will survive any expiration or termination of this Agreement: this Section 14.7, Section 2.3, Section 3, Section 7.1, Section 7.2, Section 9, Section 10, Section 11, Section 13, Section 14.4, Section 14.5, and Section 15.").

[68] *Compare* SLA § 14.7, *with* AC ¶ 58; AB at 9–10. Plaintiffs allege breaches arising from Sections 2.1 (the software license), 4.1 (software integration), 6.1 (supply of software), 7.3 (support contact), 7.4 (maintenance releases), 14.1 (initial term), and 14.3 (termination). *See* AC ¶ 58. But Plaintiffs have not asserted that these terms survive the SLA's termination, nor are they enumerated in Section 14.7.

Section 7.1 does not place any obligation on the Company. Instead, it provides that, except as stated in Section 7.2, Teal Drones is "solely responsible for providing technical support to Customers for the Integrated Products, including Software incorporated in or used with the Integrated Products."[69] In order to trigger any obligations on the Company under Section 7.2, Teal Drones must first be unable to resolve customer support requests "after performing its first and second level technical support obligations as set forth in Section 7.1."[70]

Plaintiffs do not allege that any customers have requested technical support that Teal Drones was unable to provide. Thus, Plaintiffs do not allege that any obligation of the Company under Section 7.2 has been triggered. Plaintiffs' only response is that the Amended Complaint "alleges that 'Autonodyne has failed to provide customer or technical support for its software as required[]'" and that this allegation must be accepted as true.[71] Plaintiffs, however, cannot rest on a wholly conclusory allegation such as this to avoid dismissal.[72]

---

[69] SLA § 7.1.

[70] *Id.* § 7.2.

[71] AB at 18–19.

[72] *See HUMC Holdco, LLC*, 2022 WL 3010640, at *20.

The Amended Complaint also alleges that "Autonodyne has, on information and belief, disclosed Confidential Information to third parties[.]"[73] Plaintiffs allege "on information and belief" that Defendants "breached the confidentiality provision by offering third parties the opportunity to license the OEM Software features and capabilities" exclusively licensed to Teal Drones.[74]

These allegations, too, are insufficient to state a claim for breach of Section 9. "Notwithstanding Delaware's permissive pleading standard, the court may disregard mere conclusory allegations made without specific allegations of fact to support them."[75] Indeed, Delaware courts have repeatedly stated that "[p]leading serial facts 'on information and belief' is no substitute for well-pled facts that will support a reasonable inference of wrongdoing."[76]

For every alleged fact that Plaintiffs point to as supporting their blanket assertion that Defendants breached surviving obligations in Section 9, each is either alleged "on information and belief" or is not identified or even alleged to be

---

[73] AC ¶ 58; *see also id.* ¶ 34 (alleging based on serial "information and belief" statements).

[74] *Id.* ¶ 34.

[75] *HUMC Holdco, LLC*, 2022 WL 3010640, at *20.

[76] *Id.*; *see also In re Xura, Inc. S'holder Litig.*, 2019 WL 3063599, at *3.

Confidential Information.[77]  The former is "no substitute for well-pled facts," and the latter cannot form the foundation for a claim for breach of Section 9.

Attempting to illustrate Defendants' breach of Section 9, and in one of the only statements on this issue not qualified by "on information and belief," Plaintiffs assert that Defendants "did not disclose to potential purchasers that it already had exclusively licensed certain functionality of its avionics software to Teal Drones for a term of six years[.]"[78]  But this is the exact response one would expect from a party that is continuing to respect the SLA's surviving confidentiality obligation.  To do otherwise would mean to disclose some terms of the SLA, which would appear to breach Section 9 since the SLA's terms are Confidential Information.[79]

Based on the foregoing, I conclude that Section 7.1 does not place any obligation on the Company that could give rise to a claim for breach of contract.  I also conclude that Plaintiffs have failed to plead facts sufficient to state a claim for breach of contract arising under Sections 7.2 or 9.  I thus conclude that the claim for breach of contract must be dismissed.[80]

---

[77] *See, e.g.*, AC ¶ 34.

[78] *Id.*

[79] *See* SLA § 9.1.

[80] This conclusion moots the question of whether Red Cat has standing to assert claims under the SLA.

## B.     Plaintiffs Fail To State A Claim For Declaratory Judgment

Plaintiffs assert a claim for declaratory judgment.[81]  To entertain an action for declaratory judgment, there must first be an "actual controversy."[82]  This is a non-waivable jurisdictional requirement that Plaintiffs "bear[] the burden of establishing[.]"[83]

Plaintiffs assert that an "actual controversy" exists over five questions.[84]  But my conclusions on Plaintiffs' breach of contract claim resolve each of the questions Plaintiffs raise.[85]  Plaintiffs have thus failed to adequately allege that an "actual controversy" exists.

---

[81]Although Plaintiffs bring this claim against the Company and Schwinn, for procedural reasons, this decision only resolves the claim as to the former.  Schwinn's motion to dismiss for lack of personal jurisdiction is, as noted above, the subject of a separate order.

[82] *XL Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (explaining that an actual controversy exists where four prerequisites are satisfied).

[83] *Reylek v. Albence*, 2023 WL 4633411, at *6 (Del. Super. July 19, 2023).

[84] AC ¶ 83.

[85] Among other things, and as it aligns with the five numbered questions Plaintiffs raise, I concluded that it is not reasonably conceivable that: (1) Teal Drones complied with Section 15.3; (2) the Press Release complied with the requirements set forth in Section 9; (4) the Company failed to properly exercise its termination rights under the SLA; and (5) the SLA is valid and binding as to any provisions other than those identified in Section 14.7 and that Defendants breached any of these remaining obligations.  Plaintiffs' question (3) asks whether the Press Release mischaracterizes the SLA.  This is relevant only to the extent it relates to whether Plaintiffs' breach of the SLA was material under Section 15.3.  Above, I concluded it is not reasonably conceivable that Plaintiffs' breach was not material.  And I arrived at this conclusion without reaching the issue of mischaracterization.  Thus, this

I am then left unable to entertain Plaintiffs' declaratory judgment claim and must dismiss it as to the Company.

## C.    Plaintiffs Fail To State A Claim For Breach Of The Implied Covenant

Plaintiffs assert a claim for breach of the implied covenant of good faith and fair dealing. "The implied covenant is inherent in all contracts and is used to infer terms 'to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'"[86] "The implied covenant, however, is a 'cautious enterprise.' As we have reinforced on many occasions, it is 'a limited and extraordinary legal remedy' and 'not an equitable remedy for rebalancing economic interests that could have been anticipated.' It cannot be invoked 'when the contract addresses the conduct at issue.'"[87]

Plaintiffs argue both that there are certain contractual gaps in the SLA that the implied covenant must fill, and the Company exercised its discretion in an arbitrary or unreasonable manner.[88]

---

purported controversy cannot serve as a stand-alone basis for a claim for declaratory judgement.

[86] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)).

[87] *Glaxo Grp. Ltd.*, 248 A.3d at 920 (footnotes omitted).

[88] AC ¶¶ 70–72.

### 1. Gap Filling

"To sufficiently plead breach of the implied covenant of good faith and fair dealing, a complaint 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'"[89]

Plaintiffs fail to identify any contractual gap suitable for the implied covenant's application. They suggest three possible gaps, two of which arise from Section 15.3's lack of express definitions for (1) "prior written consent" and (2) "unreasonably withheld."[90] The third is based on the SLA "not address[ing] the present scenario where one party has purported to terminate the SLA, the other party objects," and the SLA's purpose has "ceased."[91]

Plaintiffs can only state a claim under the first two if I assume that Plaintiffs sought the Company's consent. But they did not. For their third alleged "gap," Plaintiffs try to conjure a claim out of an imagined termination-objection process. But the implied covenant cannot be employed to override express terms or provide a party a right it did not obtain at the bargaining table.[92]

---

[89] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020).

[90] AC ¶ 72.

[91] *Id.*

[92] *See Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 183 (Del. Ch. 2014) ("[B]ecause the implied covenant is, by definition, implied, . . . it cannot be invoked where the contract

Plaintiffs seem to understand the implied covenant to apply—in a manner nearing infinite regress—anytime that a word or a phrase is used and not defined in a contract's express terms. And, after claiming to have identified contractual gaps, Plaintiffs jump to the conclusion that they have stated a claim for breach of the implied covenant. That is a head-scratcher.

Plaintiffs failed to identify any suitable contractual gaps for the implied covenant to fill. This deficiency alone can end my analysis.[93] But even assuming Plaintiffs had identified some gap, they also do not plead any "specific implied contractual obligation."[94] Plaintiffs' failure to propose *any* term to fill the purported gaps leaves the Company shadowboxing—hoping to guess the implied terms it has supposedly breached.

But again, even if I found a suitable gap *and* proper term to fill it—a starting point requiring mental gymnastics—Plaintiffs still fail to allege that the Company breached those terms. Instead, Plaintiffs opt for the inarticulate assertion that

---

itself expressly covers the subject at issue."), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015); *S'holder Representative Servs. LLC v. Albertsons Cos., Inc.*, 2021 WL 2311455, at *8 (Del. Ch. June 7, 2021) ("[T]he implied covenant will not serve as a means to provide contractual protections that parties 'failed to secure for themselves at the bargaining table.'").

[93] *See, e.g.*, *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) ("We decline to apply the implied covenant here because no gap exists . . . .").

[94] *Sheehan*, 2020 WL 2838575, at *11.

"Autonodyne's conduct constitutes one or more breaches of the implied covenant of good faith and fair dealing . . . ."[95] This befuddlingly vague assertion is set forth in wholly conclusory terms of the sort I must reject. As noted previously, "[i]f a complaint were held sufficient simply because it restates the legal elements of a particular cause of action, Rule 8(a) would be rendered meaningless."[96]

Based on the foregoing, I conclude that Plaintiffs fail to state a claim arising from the implied covenant's "gap filling" function.

### 2. Discretion

Plaintiffs further press their implied covenant claim by arguing that the Company acted arbitrarily or unreasonably. "Beyond its gap filling function, the implied covenant applies 'when a party to the contract is given discretion to act as to a certain subject and it is argued that the discretion has been used in a way that is impliedly proscribed by the contract's express terms.'"[97] The implied covenant "requires in part that a party vested with discretion under a contract exercise its discretion reasonably, in good faith, and not in an unreasonable or arbitrary way that would destroy the counterparty's right to receive the fruits and benefits which they

---

[95] AC ¶ 73.

[96] *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *4 n.28.

[97] *Chordia v. Lee*, 2024 WL 49850, at *36 (Del. Ch. Jan. 4, 2024) (quoting *SerVaas v. Ford Smart Mobility LLC*, 2021 WL 3779559, at *10 (Del. Ch. Aug. 25, 2021)).

reasonably expected to receive under the contract."[98] "When determining the parties' reasonable expectations, the court analyzes 'whether the parties would have bargained for a contractual term proscribing the conduct that allegedly violated the implied covenant had they foreseen the circumstances under which the conduct arose.'"[99]

Plaintiffs assert that the Company acted arbitrarily or unreasonably by (1) purporting to terminate the SLA, (2) refusing to perform its obligations under the SLA, and (3) shopping its software capabilities to third parties that it had exclusively licensed to Teal Drones.[100]

As to each, Plaintiffs fail to identify the contractual discretion suitable for application of the implied covenant. I begin with the Company's exercise of multiple express contract rights to terminate the SLA.

> It is one thing to imply a good faith obligation when the parties have expressly agreed that a certain act is within a party's discretion. It is another matter to imply discretion to restrict actions expressly permitted by the parties' agreement. The implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party. It should not be used to imply terms that modify or negate an unrestricted contractual right authorized by an agreement.[101]

---

[98] *Menn v. ConMed Corp.*, 2022 WL 2387802, at *39 (Del. Ch. June 30, 2022).

[99] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1118 (2022).

[100] AC ¶ 71.

[101] *Glaxo Grp. Ltd.*, 248 A.3d at 920–21 (footnotes omitted).

Plaintiffs seek just such a restriction on the Company's exercise of its express contract rights to terminate the SLA under Section 14.3. Such use of the implied covenant is improper.

Moreover, had the parties foreseen these circumstances, it is not reasonably conceivable that they would have "bargained for a contractual term proscribing" the Company from terminating the SLA in this manner.[102] That much is apparent on the SLA's face. The parties that entered the SLA anticipated these circumstances. And, having anticipated them, the parties did not proscribe the SLA's terminability. Instead, they wrote this very script into the SLA's terms. "Here, contrary to being impliedly proscribed by the [SLA]'s express terms, the [Company] terminated the [SLA] pursuant to [the] express contract term[s]."[103]

In setting forth the second and third bases, Plaintiffs fail to demonstrate the exercise of any contractual discretion to which the implied covenant might apply. Plaintiffs allege the Company stopped performing and began shopping its software to third parties *after* it terminated the SLA. It follows that these acts were not undertaken pursuant to the exercise of any discretion provided by the contract—as

---

[102] *Baldwin*, 283 A.3d at 1118.

[103] *Chordia*, 2024 WL 49850, at *36.

this application of the implied covenant requires.[104]  Instead, these were the acts of a party unbridled by the then-defunct obligations in the SLA—a defunct state the parties anticipated and wrote into the SLA's terms upon the happening of Plaintiffs' disclosure of Confidential Information.

Indeed, even to the extent an obligation did exist, it follows that the SLA's express terms would control, and this would not be the unanticipated and silent circumstances suitable for the implied covenant's application.  Plaintiffs cannot deploy the implied covenant to obtain, through litigation, superior rights that they "failed to secure for themselves at the bargaining table."[105]

Based on the foregoing, I conclude that Plaintiffs fail to state a reasonably conceivable claim for breach of the implied covenant flowing from any discretion provided under the SLA.  Accordingly, I must dismiss the claim for breach of the implied covenant.

---

[104] *Glaxo Grp. Ltd.*, 248 A.3d at 920–21 ("The implied covenant imposes a good faith and fair dealing obligation when *a contract confers discretion* on a party.") (emphasis added); *ConMed Corp.*, 2022 WL 2387802, at *39 ("The implied covenant of good faith and fair dealing requires in part that a party vested *with discretion under a contract* exercise its discretion reasonably, in good faith, and not in an unreasonable or arbitrary way . . . .") (emphasis added).

[105] *See Albertsons Cos., Inc.*, 2021 WL 2311455, at *8.

**D.      Injunctive Relief Is A Remedy And Not A Cause Of Action**

Plaintiffs have asserted a claim for injunctive relief.  Defendants argue that this claim is a remedy and not a cause of action, thus requiring dismissal.  I agree.

It is well-established that "[i]njunctions are a form of relief, not a cause of action."[106]  This conclusion compels dismissal.[107]  But even considering it for its substance, as pled, it is predicated on the continuation of the SLA's exclusivity provision.  Having failed to adequately plead the survival of this obligation, Plaintiffs' assertions here cannot state a reasonably conceivable claim.

## III.      Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part. Counts I, II, and V in Plaintiffs' Amended Complaint are dismissed in their entirety. Count IV is dismissed as to the Company.

**IT IS SO ORDERED.**

Sincerely,

*/s/ Nathan A. Cook*

Vice Chancellor

---

[106] *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014).

[107] *See id.* (dismissing two counts because they "seek remedies rather than assert claims"); *Lidya Hldgs. Inc. v. Eksin*, 2022 WL 274679, at *7 (Del. Ch. Jan. 31, 2022) (dismissing claim for injunctive relief).